PAUL A. BONIN, Judge.
 

 hThe appellant, Toni Lynn Swain Orrill Jenkins (“Mrs. Jenkins”), appeals a judgment of the trial court designating her former husband, R. Ray Orrill, Jr. (“Mr. Orrill”), as the primary custodial parent of their minor son, J.O., and awarding her visitation three (3) weekends per month. We affirm the judgment of the trial court.
 

 FACTS AND PROCEDURAL HISTORY
 

 The parties were married in July 1997, and J.O., the only child of the marriage, was born in 1998. Mrs. Jenkins has an
 
 *281
 
 other son, E.M., from a prior marriage. He was born in 1991.
 

 On July 11, 2005, Mr. Orrill filed a petition for divorce pursuant to La. Civ.Code art. 102, and a judgment of divorce was rendered on April 5, 2006. Pursuant to a consent judgment of August 16, 2005, the parties agreed to joint custody of J.O., with Mr. Orrill designated as the interim primary custodial parent until the end of the 2005-2006 school year, at which time the custodial arrangement would be reviewed. Prior to executing the consent judgment, Mrs. Jenkins purchased a home and moved away to Covington, Louisiana in St. Tammany Parish. During |athe marriage the parties and J.O. had resided in a house on Lark Street in New Orleans and J.O. had attended private school in Metair-ie. After the divorce Mr. Orrill and J.O. continued to live in the Lark Street home and J.O. continued in the same school.
 

 After the 2005-2006 school year ended, Mr. Orrill filed an expedited motion to establish permanent custody. Following a hearing, the trial court rendered judgment on August 11, 2006, maintaining the existing custodial arrangement. The judge found that it was in the best interest of J.O. that Mr. Orrill remained the interim primary domiciliary parent and that J.O. continued his education at Metairie Park Country Day School for one additional year, making the custodial arrangement reviewable again at the end of the 2006-2007 school year. The trial court decided that moving J.O. to a school in St. Tammany Parish would be too much of an adjustment for the child and Mr. Orrill could provide a more stable home at that time.
 

 In November 2006, Mrs. Jenkins began dating her current husband, Andrew Jenkins, and, shortly thereafter, he and his nine-year-old daughter, A.J., moved into Mrs. Jenkins’ Covington home. On April 23, 2007, Mr. Jenkins and Mrs. Jenkins were married.
 

 In May 2007, Mrs. Jenkins requested an ex parte change of custody and filed a motion for a temporary restraining order and preliminary injunction, seeking to enjoin Mr. Orrill’s physical custody of J.O. Specifically, she alleged that on the nights of April 19, 2007 and May 25, 2007, while J.O. was in his care, Mr. Orrill 13was so inebriated that he posed a danger to the child. Following a hearing, the trial court denied the motion.
 

 After the Jenkinses were married, Mr. Orrill filed a Motion to Set Final Custody which the trial court heard over several days in September and November 2007. On January 11, 2008, the trial court rendered a judgment granting the parties joint custody, with Mr. Orrill designated as the primary custodial parent, and Mrs. Jenkins with visitation rights three weekends per month. Mrs. Jenkins appeals the judgment.
 

 STANDARD OF REVIEW
 

 In child custody cases, appellate courts will not disturb an award of custody absent a manifest abuse of discretion in the trial court. See Revision Comments — 1993 to La. Civil Code art. 134, Comment (b). In
 
 Bergeron v. Bergeron,
 
 492 So.2d 1193 (La.1986), the Louisiana Supreme Court described the appellate review standard by stating that “upon appellate review, the determination of the trial judge in child custody matters is entitled to great weight, and his discretion will not be disturbed on review in the absence of a clear showing of abuse.”
 
 Id.
 
 at 1196.
 
 See also AEB v. JBE,
 
 99-2668, p. 7 (La.11/30/99), 752 So.2d 756, 761.
 

 DISCUSSION
 

 
 *282
 
 In the first of her two
 
 [1]
 
 assignments of error, Mrs. Jenkins argues that the district court abused its discretion in designating Mr. Orrill as the primary Udomiciliary custodian and granting her visitation three (3) weekends per month. Specifically, she contends the evidence demonstrates that she is a full-time, stay-at-home mother, who resides with J.O.’s stepfather, stepsister and half-brother, while Mr. Orrill, an attorney, works a minimum of 45 hours per week and lives “alone”. Thus, Mrs. Jenkins contends, she is the parent who should have primary custody as she has more time to spend with J.O. during the week while Mr. Orrill has more free time on the weekends. Mrs. Jenkins further argues that the court appointed custody evaluator, Dr. Karen van Beyer, recommended that it would be in J.O.’s best interest to live in the two parent household with his siblings. Mrs. Jenkins also claims that J.O. expressed his preference to live with her and that he has exhibited signs of depression since Mr. Orrill was awarded primary domiciliary custody.
 

 “In a proceeding for divorce or thereafter, the court shall award custody of a child in accordance with the best interests of the child.” La. Civ.Code art. 131. The “best interest of the child principle [is] the principal substantive criterion for granting and changing custody.”
 
 Bergeron,
 
 492 So.2d at 1197.
 
 [2]
 
 In the absence of an agreement between the parents as to custody, “or if the agreement is not in the best interests of the child, the court shall award custody to the parents jointly; however, if custody in one parent is shown by clear and convincing evidence to | r,serve the best interests of the child, the court shall award custody to that parent.” La. Civ.Code art. 132.
 

 Factors to consider in determining the best interest of the child are provided in La. Civ.Code art. 134, which reads:
 

 The court shall consider all relevant factors in determining the best interest of the child. Such factors may include:
 

 (1) The love, affection, and other emotional ties between each party and the child.
 

 (2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
 

 (3) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.
 

 (4) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.
 

 (5) The permanence, as a family unit, of the existing or proposed custodial home or homes.
 

 
 *283
 
 (6) The moral fitness of each party, insofar as it affects the welfare of the child.
 

 (7) The mental and physical health of each party.
 

 (8) The home, school, and community history of the child.
 

 (9) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
 

 (10) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.
 

 (11) The distance between the respective residences of the parties.
 

 (12) The responsibility for the care and rearing of the child previously exercised by each party.
 

 Differing Opinions of Experts
 

 Mrs. Jenkins’ argument relies heavily on the opinion testimony of Dr. van Beyer, who the trial court both appointed and accepted as an expert witness. Her testimony, opinion, and recommendations were generally very favorable to the Impositions espoused by Mrs. Jenkins regarding the future custody of J.O.
 
 [3]
 
 However, the trial judge, at Mr. Orrill’s request, had appointed and accepted an additional expert witness, Dr. Beverly Howze.
 
 See
 
 generally La. C.E. arts. 701
 
 et seq.
 
 Her testimony, opinion and recommendations differed considerably from Dr. van Beyer’s.
 

 By the conclusion of the trial, the judge did not accept the recommendations of Dr. van Beyer. Declining to adopt a court-appointed expert’s custody recommendation is not error.
 
 Monteleone v. Monteleone,
 
 591 So.2d 1228, 1236 (La.App. 4th Cir.1991). “After weighing and evaluating expert and lay testimony, the trial court may accept or reject the opinion expressed by any expert.”
 
 Warlick v. Warlick,
 
 27,389 (La.App. 2 Cir. 9/29/95), 661 So.2d 706, 710.
 

 The record reflects that Dr. van Beyer interviewed J.O.; Mr. Orrill, Mrs. Jenkins, Mr. Jenkins, and Dr. William Walker, J.O.’s godfather and a close friend of Mr. Orrill. She also spoke to Leigh Collins, J.O.’s school counselor; and Dr. Lynn Parker, a psychologist who had treated J.O. for anxiety, depression and attention deficit, hyperactivity disorder (ADHD). Based on numerous interviews and conversations, Dr. van Beyer recommended to the trial court that primary domiciliary custody be transferred from Mr. Orrill to Mrs. Jenkins. In her opinion, J.O. needed a stable home life for his emotional health and that he would benefit most by living with his mother and stepfather in a two-parent household along with his half-brother and stepsister.
 

 |7Because Mrs. Jenkins claimed that Mr. Orrill had an alcohol problem, Dr. van Beyer had recommended that he be evaluated by Dr. Ken Roy, a psychiatrist and substance abuse specialist, and a referral was made. Dr. Roy evaluated Mr. Orrill, but Dr. van Beyer did not await the results of Dr. Roy’s evaluation before she submitted her custody evaluation report to the court in which she recommended a change in primary domiciliary custody.
 

 Dr. Howze performed the second custody evaluation. She interviewed the same persons as Dr. van Beyer
 
 plus
 
 Mrs. Jimmie Oleaga, a person who assisted Mr. Orrill with taking care of J.O. in Mr. Or-rill’s absence, Dr. Rosencrantz, the parties’
 
 *284
 
 marriage therapist, Dr. Steven Jones and Dr. Joa Montano, Mr. OrrilTs neighbors, and J.O.’s siblings, E.M. and A.J. Of course Dr. Howze agreed with Dr. van Beyer that J.O. needed a stable, secure home. She differed with Dr. van Beyer on
 
 which
 
 parent should be the primary custodian. Dr. Howze recommended that J.O. remain in the primary custody of his father and continue to attend Metairie Park Country Day School.
 

 “The rule that questions of credibility are for the trier of fact applies to the evaluation of expert testimony, unless the stated reasons of the expert are patently unsound.”
 
 Lasyone v. Kansas City Southern Railroad,
 
 2000-2628, p. 13 (La.4/3/01), 786 So.2d 682, 693 (citation omitted). Credibility determinations, including the evaluation of and resolution of conflicts in expert testimony, are factual issues to be resolved by the trier of fact and should not be disturbed on appeal in the absence of manifest error.
 
 Id.
 

 The trial judge gave us the benefit of thorough and comprehensive findings and conclusions in his reasons for judgment. He clearly explained why he accepted Dr. Howze’s recommendation and rejected Dr. van Beyer’s in this case. |sDr. van Beyer’s opinion that Mrs. Jenkins was better able to provide J.O. with a stable, secure home was based, the trial judge found, on subjective statements made by Mrs. Jenkins which Dr. van Beyer accepted as true without further validation. Conversely, the court “was impressed” that Dr. Howze consistently cross-validated the information provided to her by the parties and others. The court noted that Dr. van Beyer accepted as true Mrs. Jenkins’ allegation that Mr. Orrill had a drinking problem and considered that an important factor in recommending a change in primary domiciliary custody. Yet, as emphasized by the trial court, Dr. van Beyer did not have the benefit of Dr. Roy’s evaluation when she reached such a conclusion and recommendation. Dr. Roy found no objective evidence of substance abuse by Mr. Orrill. Not only did Dr. Howze, prior to recommending that Mr. Orrill remain the primary custodial parent, consider Dr. Roy’s report, she also confirmed with Dr. Rosen-crantz, the parties’ marriage therapist, that Mr. Orrill exhibited no signs of alcohol abuse during the marriage.
 

 Dr. van Beyer’s conclusion that Mrs. Jenkins’s new family unit was stable and secure was also rejected by the trial judge.
 
 [4]
 
 Dr. van Beyer had accepted Mrs. Jenkins’ unsubstantiated claim that her son, E.M., and her stepdaughter, A.J., had no problems and were doing well. As it turned out, both children were being treated for attention deficit disorder (ADD). Dr. Howze, for her part, had actually interviewed E.M. and A.J. Dr. Howze documented their difficulties.
 

 Dr. van Beyer seemed unaware of other important aspects of Mrs. Jenkins’ situation, which have grave bearing on an appropriate recommendation for custody. The Jenkinses were living in a two-bedroom house in Covington. When [ ^staying in that house, J.O. shared a bedroom with his stepsister of the same age. The older brother E.M. had a room in a detached garage. The mortgage lender had a foreclosure suit pending against Mrs. Jenkins because she had not made any mortgage payments since she purchased the house in August of 2005. Although the Jenkinses were not paying the mortgage note on the
 
 *285
 
 family’s primary residence, Mr. Jenkins was nonetheless paying a monthly note of $1,325 on a vacant cabin. Dr. van Beyer admitted at trial that her recommendation may have been different had she known of the Jenkins’ financial status and the pending foreclosure suit.
 

 Dr. Howze also called the trial court’s attention to an important matter which bears on the question of which home was the better for J.O. Mr. and Mrs. Jenkins began them romance just three weeks after his wife died in November 2006. By January 2007, they were living together and in April they married. The first Mrs. Jenkins’ death was sudden. Dr. Howze suspected that Mr. Jenkins may not have allowed himself adequate grieving time and that A.J., the daughter, was still “suffering from predictable traumatic stress” due to the loss of her mother. Introducing J.O. to this situation was, in Dr. Howze’s opinion, not ideal.
 

 The findings and recommendations of Dr. Howze are clearly supported by the evidence. Dr. van Beyer’s findings and recommendations are clearly not as sound when considered in light of the evidence and in view of Dr. van Beyer’s own admission.
 

 Ramifications of the Jenkins’ Financial Problems
 

 The trial judge received considerable other evidence which was not directly the subject of the experts’ inquiry, but which is important to the trial judge’s | ^discharge of his duty to determine J.O.’s best interests in selecting the appropriate primary custodial parent.
 

 We previously discussed the living circumstances and the pending foreclosure suit on the house in which J.O.’s mother, stepfather, half-brother and stepsister reside. Mrs. Jenkins quit her $55,000.00 per year job to be a “stay-at-home mom.” The Jenkins’ financial ability to provide J.O. with stability and security were further jeopardized when Mr. Jenkins quit his long-time job with Shaw Sunland Fabricators and became self-employed. He is earning $1,000.00 per week less expenses. As a result, the Jenkins can barely meet their monthly expenses on Mr. Jenkins’ income. Moving J.O. into this financially unstable household, which could be displaced or dispersed at any time could hardly support a finding to make Mrs. Jenkins the custodial parent. One can readily appreciate the trial judge’s resolution of the factor concerning “[t]he permanence, as a family unit, of the existing or proposed custodial home or homes.” La. Civ.Code art. 134(5).
 

 Mother’s Actions Alienating Son from Father
 

 One of the important factors that a court is to consider when determining the best interests of a child, is the “willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.” La. Civ.Code art. 134(10). On this factor the trial judge found Mrs. Jenkins seriously wanting. Regarding four separate events or instances the trial court questioned whether Mrs. Jenkins was acting in the best interest of J.O. or merely to “further her own agenda.” The court found that Mrs. Jenkins had exposed J.O. to unnecessary police intervention on four occasions in less than a year.
 

 InOn April 20, 2007, at 1:00 a.m., J.O. called his mother, stating that he had awakened and was unable to awaken his father. While still on the phone, at his mother’s urging, J.O. left the house and went across the street to the home of Dr. Jones and Dr. Montano, both physicians. Dr. Jones spoke on the phone with Mrs. Jenkins. Mrs. Jenkins did not ask that Dr. Jones or Dr. Montano check on Mr.
 
 *286
 
 Orrill. Instead, Mrs. Jenkins called the police and drove from Covington to Mr. Orrill’s home in New Orleans. When she arrived the police had already arrived. The trial court recalled that at the earlier hearing on Mrs. Jenkins’ motion for a temporary restraining order and ex parte change of custody, the police officer had testified that when they arrived at the scene, Mr. Orrill was coherent, responsive, and was not slurring his speech or stumbling.
 

 In the second incident on May 25, 2007, Mrs. Jenkins claimed that J.O. called her several times that evening, beginning at 7:30 p.m., concerned that his father was drinking. Worried about her son, she decided to go to Mr. Orrill’s house to check on J.O. Mr. and Mrs. Jenkins drove across the Causeway Bridge, stopping for 15 minutes to wait for the police escort which Mrs. Jenkins had requested. When Mrs. Jenkins arrived at Mr. Orrill’s home at 11:30 p.m., J.O. was outside of the house in the street. Mr. Orrill admitted that he had had two or three glasses of wine with Dr. Jones and Dr. Montano earlier that evening. Although the police officers at the scene had some difficulty waking Mr. Orrill, when he was awakened he was coherent and responsive. Further, blood pressure and glucose readings taken at the scene by the emergency medics were described as being within normal limits. The trial court questioned why Mrs. Jenkins waited 15 minutes for a police escort, knowing that J.O. was in the street on the phone.
 

 |[2In the third incident the court noted that Mrs. Jenkins called the police because Mr. Orrill put Godiva chocolate liqueur on J.O.’s ice cream. Unaware that the chocolate was in fact alcohol, Mr. Orrill put only a small spoonful on the ice cream. He testified it was an honest mistake. The fourth incident involved Mrs. Jenkins bringing J.O. to the police station on June 14, 2007, to ask if the officers involved in the April and May 2007 incidents would testify at trial.
 

 Elaborating on the four incidents, the trial court found that J.O.’s alleged “fear” of his father’s drinking was created in his mind by the actions of his mother. The trial court determined that in connection with his parents’ divorce, Mrs. Jenkins had unnecessarily exposed J.O. to the police adding more trauma to the child’s life. Her actions, the court stated, amounted to “parental alienation” and demonstrated her unwillingness to facilitate a close relationship between J.O. and his father.
 

 The Lark Street Home Environment
 

 One factor in considering what is in J.O.’s best interest is “[t]he length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.” La. Civ.Code art. 134(4).
 

 Dr. van Beyer had thought that granting Mrs. Jenkins primary domiciliary custody would have allowed J.O. to spend more time with both of his parents, and obviated Mr. Orrill’s need for outside help taking care of J.O. while he was working during the week. The trial court concluded otherwise. Mrs. Olegea assisted the parties in caring for J.O. since the parties were married. After they divorced, Mrs. Oleaga picked J.O. up from school each day at 3:00 p.m. and cared for him until Mr. Orrill returned home from work, usually between 6:00 and 6:30 p.m. The court indicated there was contradictory testimony that J.O. spends less Intime with Mrs. Oleaga now than he did when his parents were married. Thus, the trial court found that continuing the existing custody arrangement did not unfairly limit the time J.O. spent with either parent. Moreover, Mrs. Oleaga’s interest and involvement in J.O.’s life supports the trial court’s determination
 
 *287
 
 that Mr. Orrill should be the primary custodial parent in evaluating J.O.’s best interest.
 

 Overall Credibility Problem, of Mrs. Jenkins
 

 Mrs. Jenkins made allegations of domestic violence. Curiously Mrs. Jenkins reported to Dr. Howze her claims of domestic abuse during the marriage, but made no such claims to Dr. van Beyer. This inconsistency, the trial court stated, “causes this Court to question her credibility.”
 

 In summarizing its findings, the trial court stated:
 

 The Court finds that the evidence presented does not support a finding of substance abuse or dependency and it does not support a pattern of violence or battering. Additionally, many of the other allegations made by Mrs. Jenkins were found to have no merit, when cross validation took place.
 

 Considering all of the distractions present in Mrs. Jenkins’ life, i.e., the fact that her house note had not been paid in over 1½ years, a foreclosure lawsuit, the Adler’s lawsuit, a new marriage, a stepchild with ADD, a teenage son with ADD, it is the opinion of this Court that Mr. Orrill is in a better position to provide [J.O.] with the stability, structure, and organization that he needs to achieve and succeed. At this point, there are too many unpredictable variables in this new family structure that put [J.O.] at risk. Additionally, Mrs. Jenkins’ actions in exposing her son to unnecessary police intervention on at least four (4) separate occasions establishes to this Court an inability to facilitate and encourage a close and continuing relationship between [J.O.] and Mr. Orrill.
 

 This Court finds it to be in [J.O.J’s best interest to resume a predictable, routine schedule with an educational support system in place at Country Day, as opposed to transferring to a new school, which will necessarily involve adjustments and changes.
 

 114The record in this case clearly reflects that the trial court discredited much of Mrs. Jenkins’ testimony. It further demonstrates that the court accepted and found more credible the expert testimony, evaluation report and recommendations given by Dr. Howze in rendering its judgment. Giving deference to the trial court’s credibility determinations, as to lay and expert witnesses and as among all witnesses,
 
 see Rosell v. ESCO,
 
 549 So.2d 840, 844 (La.1989), we find the trial court did not abuse its discretion in granting the parties joint custody, with Mr. Orrill designated as the domiciliary parent, and awarding visitation to Mrs. Jenkins on three weekends per month. This simply maintained the existing arrangement. The testimony and documentary evidence in the record clearly support the trial court’s findings.
 

 Exclusion of Police Report Evidence
 

 In her second assignment of error, Mrs. Jenkins argues that the trial court erred in not allowing her to introduce into evidence at the hearing on the motion for a temporary restraining order and preliminary injunction a copy of the written police report relating to the May 25, 2007 incident. That proceeding was in connection with her efforts to obtain at first an
 
 ex parte
 
 change of custody or, in effect, to enjoin Mr. Orrill’s exercise of his custodial rights. During that proceeding Mrs. Jenkins did not, in the face of the trial court’s ruling that the police report was inadmissible, proffer the police report. La. C.E. art.
 
 *288
 
 103(A)(2).
 
 [5]
 
 Mrs. Jenkins did not seek supervisory writs to seek a review of the trial court’s evidentiary ruling. La. C.C.P. art. 2201. Most importantly, she did not appeal the July 9, 2007 judgment denying the preliminary injunction, which was an 11Rappealable judgment. La. C.C.P. arts. 1841 and 3612(B). The judgment of July 9, 2007 is now final. La. C.C.P. art. 3612(C). Thus, Mrs. Jenkins cannot obtain relief from any ruling related to that judgment in the present appeal.
 

 DECREE
 

 Accordingly, for the reasons set forth in this opinion, the January 11, 2008 judgment of the trial court is affirmed.
 

 AFFIRMED.
 

 [1]
 

 . Her second assignment of error does not concern this judgment before us on appeal. It is treated in the section on "Exclusion of Police Report Evidence”.
 

 [2]
 

 . We recognize in this case that there had been prior evidentiary hearings which had resulted in expressly provisional judgments regarding interim arrangements, although for extended periods. In relying on
 
 Bergeron
 
 and some other "change of custody” decisions in this opinion for more general standards, we, like the trial court, have not applied the following
 
 Bergeron
 
 "burden of proof rule”: "When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence that the harm likely to be caused by the change of environment is substantially outweighed by its advantages to the child.”
 
 Bergeron,
 
 492 So.2d at 1200.
 

 [3]
 

 . Even if Dr. van Beyer had been the
 
 only
 
 expert witness recognized by the court, the court would still remain free to accept or reject the expert's conclusions.
 
 State v. Smith,
 
 1996-261 (La.App. 3 Cir. 12/30/96), 687 So.2d 529.
 

 [4]
 

 . "Ultimately, the weight to be given expert testimony is dependent upon the facts on which it is based as well as the professional qualifications and experience of the expert. If the opinion is based on facts not supported by the record, the opinion may be rejected.”
 
 Meany v. Meany,
 
 94-0251 (La.7/5/94), 639 So.2d 229, 236.
 

 [5]
 

 . La. C.E. art. 103(A) requires that a party establish that "a substantial right of the party is affected” as a condition for predicating an error. The record indicates that Mrs. Jenkins desired to use the police report to impeach a police officer who was not the witness and who had not prepared the report.