SANDRA CABRINA JENKINS, Judge. •
[Jn this child custody dispute, Jeanne Hilkirk[1] appeals the trial court’s March 3, 2015 judgment ordering an immediate change in custody of the minor child, L.J., having found that Jacob Johnson satisfied the required burden of proof on a party seeking to modify a considered custody decree pursuant to Bergeron v. Bergeron.[2] Under the terms of the prior considered custody decree, the parties were awarded joint custody of L.J., with Ms. Hilkirk having physical custody of L.J. and Mr. Johnson having regular alternating weekend and holiday visitation with the child.[3] In 2014, both parties filed motions to modify custody that were heard by the trial court on February 27, 2015. At the conclusion of the hearing, the trial court ordered an immediate change in custody from joint custody to sole custody in Mr. Johnson. The trial court further ordered strict limitations on contact between Ms. Hilkirk and the child, including no contact for the first two months Land no visitation for Ms. Hilkirk until the seventh month from the date of the hearing.
Upon our review of the record in light of the applicable Bergeron standard, we find that the trial court manifestly erred in finding that Mr. Johnson satisfied his required burden of proving that a material change of circumstances had occurred such that the continuation of the contested custody arrangement was so deleterious to the child as to justify removing her from the environment to which she was accustomed, or proving by clear and convincing evidence that the harm likely to be caused by a change of environment was substantially outweighed by its advantages to the child. See, e.g., Mulkey v. Mullcey, 12-2709, pp. 10-11 (La.5/7/13), 118 So.3d 357, 365. For the reasons that follow, we reverse the trial court’s judgment granting sole custody of L.J. to Mr. Johnson, we reinstate the joint custody award, finding it in the best interest of’ L.J., and we remand for proceedings consistent with this Court’s ruling.
FACTUAL AND PROCEDURAL BACKGROUND
Jeanne Hilkirk and Jacob Johnson began dating in 1999 and, soon thereafter, Ms. Hilkirk became pregnant. Their daughter, L.J., was bom on May 15, 2000. Ms. Hilkirk and Mr. Johnson never married and, within the first few years of L. J.’s life, their relationship dissolved.
In September 2001, while Ms. Hilkirk and Mr. Johnson were both living in St. Bernard Parish, they entered into a consent judgment regarding custody of L.J. Pursuant to that consent judgment, the parties agreed that Ms. Hilkirk would have |ssole custody of L.J., and Mr. Johnson' would exercise visitation with L.J. on alternating weekends from Saturday at 9:00 a.m. until Sunday at 6:00 p.m.[4] In addition, Mr. Johnson was ordered to pay Ms. Hilkirk child support in the amount of $350.00 per month.
Mr. Johnson exercised regular visitation with L.J. until she was four years old. *735 During those four years, his relationship with Ms. Hilkirk became increasingly contentious. At some time in 2004 and. 2005, Mr. Johnson moved to Mississippi and Ms. Hilkirk moved to Slidell, Louisiana. In Mississippi, Mr. Johnson had another daughter, F.T.J., with whom he also had regular visitation on alternating weekends.
In July 2005, Mr. Johnson had the 2001 consent judgment made executory by the 22nd Judicial District Court in St. Tammany Parish where Ms. Hilkirk was residing with L.J. Mr. Johnson then filed a rule for contempt against Ms. Hilkirk, alleging that she had denied him .visitation with L.J. In August 2005, in the 34th. Judicial District Court, Ms. Hilkirk filed a motion against Mr. Johnson to terminate visitation, alleging that he could not properly care for L.J. or provide a safe, stable environment for her and that it was in the best interest of L.J. that Mr. Johnson’s visitation rights be terminated. In March 2006, prior to a hearing on his rule for contempt, Mr. Johnson also filed a rule to modify custody, seeking joint custody and increased visitation. In February 2007, Mr. Johnson filed a motion to transfer 14the rules for contempt and for modification of custody from the 22nd Judicial District Court to the 34th Judicial District Court where Ms. Hilkirk’s motion to terminate visitation was pending. The transfer was granted, and all pending custody matters were transferred to and consolidated by the 34th .Judicial District Court.
On March 18, 2008, the trial court suspended Mr. Johnson’s visitation with L.J. pending the completion of a custody evaluation in which both parties were ordered to participate, pursuant to La. R.S. 9:331.[5] On April 15, 2008, the trial court appointed Alicia Pellegrin, Ph.D., as the custody evaluator.[6] Dr. Pellegrin submitted a seven-page custody evaluation report to the trial court on January 16, 2009.

Dr. Pellegrin’s 2009 Custody Evaluation

The custody evaluation report indicates that Dr. Pellegrin conducted individual clinical interviews with Ms. Hilkirk, Mr. Johnson, and L.J. In the beginning of her report, Dr. Pellegrin noted that Ms. Hil-kirk had sole custody of L.J. since 2001 and Mr. Johnson had not seen his daughter in several years “due to | ^allegations that Mr. Johnson physically abused his child,” which he denied. At the time of the evaluation, Mr. Johnson was seeking regular visitation with L.J.
In Dr. Pellegrin’s evaluation of Ms. Hil-kirk, she noted an “intact mental status” with no signs of depression, anxiety, or psychosis and no admitted history of mental health problems, substance abuse, legal history or trauma. Regarding Ms. Hil-kirk’s background, Dr. Pellegrin noted that she came from an intact family with a positive childhood and close relationships *736 with her parents who were married 27 years and now deceased. She had a steady work history at car dealerships in clerical and administrative work for eleven years, since the age of 20. At the time of the evaluation, Ms. Hilkirk had married recently and just given birth to her youngest child.
When asked about the relationship with Mr. Johnson, Ms. Hilkirk told Dr. Pelleg-rin that he had been abusive during their relationship and was very controlling. With regards to the allegation that Mr. Johnson had abused L.J., Ms. Hilkirk stated that when L.J. was four years old, during a time in which Mr. Johnson was exercising regular visitation, L.J. returned home with a black eye and said that her father had “punched” her. Following that incident, Ms. Hilkirk did not allow visitation for Mr. Johnson with L.J. and stated that “she filed a motion to ‘keep [L.J.] away’ from Mr. Johnson, but before it could be heard, Hurricane Katrina hit.”[7] Since that time, L.J. had not seen her father; Ms. Hilkirk stated that Mr. Johnson had not sought to visit with his daughter until 2008 when he asked for |ficourt intervention to restore visitation. Ms. Hil-kirk also stated that Mr. Johnson had not paid child support in over three years; she expressed her opinion to Dr. Pellegrin that Mr. Johnson’s parental rights should be terminated.
In Dr. Pellegrin’s evaluation of Mr. Johnson, she noted that he showed “no evidence of extreme or unusual emotional liability” or signs of depression, anxiety, or psychosis, but he was “appropriately emotional when discussing the allegations that have been made against him and the fact that he has not seen his daughter in four years,” Regarding his background, she noted that he was raised by a single mother after his parents divorced, and he described having a difficult time without a father figure growing up. Mr. Johnson denied any significant history of trauma, psychiatric problems, or legal problems.
When asked about his other daughter, F.T.J., Mr. Johnson told Dr. Pellegrin that she was “the product of a ‘one night stand’ with the child’s mother.” From the time the child was two years old, Mr. Johnson had regular visitation with his daughter on alternating weekends and time during the summer and holidays. Mr. Johnson stated to Dr. Pellegrin that during one visit with this child “he spanked her twice on the backside for acting out” and “the mother took him to court for abuse, charges that were dismissed.” Mr. Johnson told her that it was after that incident with F.T.J. that Ms. Hilkirk accused him of abusing L.J. and that the two mothers were “in cahoots.”
Regarding the allegation that Mr. Johnson had abused L.J., Mr. Johnson told Dr. Pellegrin that during one of his visits L.J. fell while riding her bike and hit her | Teye on the bike. He claimed he told this to Ms. Hilkirk and she accepted his explanation; then shortly thereafter, she accused him of punching L.J. but filed no report regarding it. Mr. Johnson indicated that he tried to subpoena Ms. Hilkirk into court for denying him visitation but “she refused to accept service.” At the time of the evaluation, he had not seen L.J. in over three years and sought to institute regular visitation with her so that he could have a relationship with his daughter.
Regarding his relationship with Ms. Hil-kirk, Mr. Johnson indicated that their relationship was contentious; he claimed that Ms. Hilkirk had been physically abusive towards him and that she cheated on him and lied about it. Mr. Johnson told Dr. *737 Pellegrin that “he decided to leave because he did not want [L.J.] growing up in such a high conflict environment.” When asked of his opinion of Ms. Hilkirk as a mother, Mr. Johnson told Dr. Pellegrin that she was “a loving mother” but she would use L.J. “as a pawn to get back at him when angry.”
Dr. Pellegrin also interviewed L.J., who was eight years old at the time of the custody evaluation. Dr. Pellegrin noted that L.J. “presented as an outgoing, friendly, and polite child who is really quite delightful and engaging;” L.J. was compliant with the evaluation and established a “good rapport.” During the interview, Dr. Pellegrin asked L.J. why they were visiting, to which L.J. responded, “[t]his is about Jacob Johnson ... he gave me a black eye.” L.J. then stated, “[m]y sister got a big giant bruise; he beat her with a hanger and she couldn’t even take a bubble bath.” Dr. Pellegrin noted that L.J. could not recall the hexact circumstances of these events, only that she was convinced that they had occurred, which “could certainly be explained by the child having been repeatedly exposed to information indicating that this occurred.”
In summary, Dr. Pellegrin found that L.J. had been “kept from her biological father despite no medical or legal evidence that he abused her.” She found Mr. Johnson’s explanation of the one alleged incident of abuse to be plausible and L.J.’s account “less than convincing.” Nonetheless, L.J. believed her father had hit her when she was four years old. Consequently, Dr. Pellegrin noted that reunification between L.J. and Mr. Johnson would be difficult, but she believed that L.J. should have the opportunity to be reunified with her father.
Based on the data obtained through her evaluation, Dr. Pellegrin offered the following recommendations to the trial court:
• L.J. and her father should consult a therapist (the same one but separately) to assist in preparing L.J. for the implementation of visitation with her father, to monitor LJ.’s reactions after visits take place, and to make any necessary adjustments to visitation based upon L.J.’s emotional state.[8]
• L.J. should begin having gradual visitation with her father, beginning with short visits of two hours at a public place; these visits should coincide with Mr. Johnson’s visitation with his other daughter, so that the two daughters may get to know one another. There should be four such visits and all should take place in Louisiana.
• After the first four Saturday visits, if there are no problems as per the therapist, the visits should be gradually increased to half-day visits coinciding with Mr. Johnson’s visitation with his other daughter. These half-day visits should continue for an additional four visits.
• If, according to the therapist, there are no problems with the additional visits, then the visitation schedule should revert to the schedule specified in the current custody judgment [September 2001 consent judgment].
h* If at any time, L.J. discloses anything to her mother or anyone regarding abuse, this information should be immediately given to the child’s therapist and only the therapist should involve the authoritiés if necessary.
• If it is concluded that Ms. Hilkirk or her family are serving as an obstructionist in LJ.’s reconciliation with her *738 father, the court should consider removing custody from Ms.. Hilkirk.
• Once the visitation has progressed to the alternating- weekend visitation specified in the current custody judgment, an updated evaluation is recom- . mended in order to determine a more equal permanent custody arrangement.
After the submission of Dr. Pellegrin’s report, the parties set the matter, for hearing regarding Dr. Pellegrin’s custody evaluation recommendations. At a hearing on September 25, 2009, the trial court appointed Dr, Pellegrin, who was present for the hearing, as a continuing custody facilitator “to assist in promulgating her recommendations through therapy.” The trial court also instructed Dr. Pellegrin to inform the court of .her further recommendations.[9] At that time, however, the trial court did not sign any order or judgment regarding the implementation of Dr. Pel-legrin’s' recommendations or reinstating visitation for Mr. Johnson.
In May 2012, Mr. Johnson filed a motion to reset with incorporated petition for custody, visitation, and decrease in child support. Mr. Johnson cited Dr. Pellegrin’s report recommending that he and L.J. become reunified through therapy and gradual increases in visitation;, he stated that since those recommendations were submitted, Ms. Hilkirk had denied him any visitation with | inL.J. Based on the recommendations, Mr, Johnson sought for the trial court to award joint custody of L.J. and to implement a regular visitation schedule.
On July 31, 2012, following a hearing on Mr. Johnson’s petition for. custody and visitation, .the trial court awarded joint custody of L.J. to Mr. Johnson and Ms. Hilkirk, without designating a domiciliary parent, and ordering visitation to resume for Mr. Johnson with L.J. every second Sunday of the month from 10 a.m. to 6 p.m. The trial court’s judgment ordered the visitation to begin on August 5, 2012 and continue on the set schedule until the next hearing in the case at which time an increase in visitation in accordance with the recommendations of the custody evaluator would be considered.
In the two years following the trial court’s joint custody decree, Mr. Johnson filed five separate rules for contempt, alleging Ms. Hilkirk denied him visitation with L.J. on several dates. Following each rule for contempt, the parties appeared before the trial court and entered into .interim consent judgments setting visitation schedules for Mr. Johnson with L.J.[10] By the terms of the July 8, 2014 interim consent judgment, the parties were ordered to submit to an updated custody evaluation, by Dr. Pellegrin.
Both parties also filed motions to modify the custody decree. In March 2014, Mr. Johnson filed a motion to modify custody in which he sought sole In custody based on the recommendations of the custody evaluator and “in light of the Mother’s continued and successful efforts to alienate the Father from the child.” In September 2014, Ms. Hilkirk filed a motion to modify *739 visitation alleging a material change in circumstances based upon information , and belief that Mr. Johnson had his . visitation with his other daughter, F.T.J., suspended by the trial court in Harrison County, Mississippi, for refusal to submit to a psychological evaluation due to allegations of abuse.
On December 15, 2014, the parties appeared on cross-motions for contempt and modification of custody. On that date, the trial court ordered Mr, Johnson to provide the December 3, 2014 Interim Order from proceedings in Harrison County, Mississippi, regarding custody of his other daughter. The trial court then continued the pending matters for hearing until such date that Dr. Pellegrin would be available to testify about her updated custody evaluation.
On February . 27, 2015, the parties appeared for a hearing on the motions to modify custody. Prior to the hearing, Ms. Hilkirk filed a motion to continue and seeking an order for the production of all pleadings from the court in Harrison County, Mississippi for this trial court to review prior to rendering a ruling on custody modification, The trial court stated that it would allow Dr. Pellegrin to testify; dependent on her testimony as to whether the Mississippi court proceedings were relevant to the present custody matter, the trial court would then rule on the motion for production of additional documents. The hearing proceeded with testimony from Dr. Pellegrin, Mr. Johnson, and Ms. Hilkirk.
| l2Pr. Pellegrin’s Testimony
By stipulation of the parties, Dr. Pelleg-rin was qualified as an expert in conducting child custody evaluations, as a forensic psychologist, and as a clinical psychologist. Dr. Pellegrin testified that she was appointed by this , trial court approximately six years earlier to conduct a custody evaluation in this matter. • After she submitted that report in 2009, she was contacted in 2014 to conduct an update to the original custody evaluation. Dr. Pellegrin stated that while her protocols for reevaluations are not as thorough or detailed as the original custody evaluation, they do involve “seeing all of the parties, the parents, the child, and speaking to any collaterals” that she deems necessary. Upon completing a reevaluation in this case, she stated that she “rendered a report in November of last year.”[11]
When asked what- collaterals she spoke' with for this updated evaluation/Dr. Pel-legrin stated that she met with Ms. Hii-kirk, Mr. Johnson, L.J., Mr. Johnson’s current wife, and Mr. Johnson’s stepdaughter from his current marriage. In addition, Dr. Pellegrin had a telephone conversation with L.J.’s therapist, she spoke with Mr. Johnson’s stepdaughter’s father, and she spoke with a long-time acquaintance of Mr. Johnson, “who also had some contact with Ms. ■ Hilkirk in the past.” Dr. Pellegrin also attempted unsuccessfully to contact the mother of Mr. Johnson’s other daughter.
113When asked if she had reviewed any documentation for her updated custody evaluation, Dr. Pellegrin stated that Ms. Hilkirk had provided her with “some court documents” from the Mississippi custody case involving Mr. Johnson and his daughter, F.T. J. According to Dr. Pellegrin, one court document stated that Mr. Johnson’s visitation with his daughter had been suspended and a second court document ordered Mr. Johnson to have a psychiatric *740 evaluation.[12] To her knowledge, Mr. Johnson had not yet completed a recent psychiatric evaluation in compliance with the Mississippi court order. However, based on her own psychological testing of Mr. Johnson and Ms. Hilkirk during the 2009 custody evaluation, Dr. Pellegrin stated that she “did not glean any information from either party” that indicated to her that a new psychological evaluation was necessary; it was up to the Mississippi court to decide if the 2009 psychological evaluation would be adequate. As matters currently stood with the Mississippi case, Dr. Pellegrin stated it was her understanding that Mr. Johnson’s visitation with F.T.J. was still suspended pending a hearing in March, 2015, to. determine whether a modification in custody or a permanent change in visitation was warranted.
When asked if she felt she needed additional documentation or information about the Mississippi case in order to supplement her custody evaluation in this custody matter, Dr. Pellegrin stated that if Mr. Johnson loses custody of F.T.J. in | ^Mississippi, then that would be an important consideration to her as a custody evaluator in this matter. Nonetheless, when asked if she would change her recommendations to the trial court at this time, Dr. Pellegrin answered, “No.” At that point, she was asked to state her current recommendations.
Dr. Pellegrin testified that, in 2009, when she conducted her initial custody evaluation, she believed that L.J. was alienated from her father; she “made a prediction that if things continued the way that they had been going, that Mr. Johnson and his daughter, [L.J.], would not have a healthy and positive relationship.” At that time, she recommended “a course of reunification therapy between the daughter and father.” But when Dr. Pel-legrin conducted the reevaluation in 2014, “it was told to [her] that they [Mr. Johnson and L.J.] had only seen each other in the six-year interim maybe a handful of times, that there had not been regular visitation and that there had still been this ongoing litigation and that the two of them did not have a healthy and positive relar tionship.” Based on that information, she believed that L.J. was even more alienated from her father. Dr. Pellegrin testified that she came to the conclusion that there were two possible ways to remedy the situation: either Mr. Johnson has to “walk away” from L.J. with the hope that when she becomes of age she will decide that she wants a relationship with him; or Mr. Johnson must be “granted full custody of [L.J.] with limited contact with her mother.” As to the latter, Dr. Pellegrin stated, “it is only through that step, as drastic as it is, that I believe [L.J.] will come to understand that it’s okay to have a relationship with her father.” She added that L.J. has been | ^“negatively influenced by others in her life” and “as long as [Mr. Johnson] only gets her every other weekend and she lives primarily with her mother, that [their] relationship will never be healthy, it will never be strong, and it will never be secure.”
Dr. Pellegrin explained that her recommendations were based upon her belief that this case involved parental alienation, stating:
*741 I believe that this child is alienated. Parental alienation is a very real -phenomenon. And I’m not talking about the old Gardner Parental Alienation Syndrome, which has' pretty much been debunked and considered junk science. But anybody who does custody evaluations knows that alienation is real and it exists and that there is typically a pattern of behavior that is — that is in place to set a child up for alienation.
In this case, Dr. Pellegrin found certain “hallmarkfej of an alienated child,” particularly that L.J. views her father in “exclusively negative terms.” Dr. Pellegrin noted that L.J. continues to “repeat the-refrain” of “Jacob Johnson punched me in the eye” despite L.J. having very little memory or context for what occurred when she was four years old; and at the time of the initial evaluation, Dr. Pelleg-rin “did not find that Mr. Johnson was a danger to his daughter.” Dr. Pellegrin also noted another “hallmark of an alienated child” is that L.J. has “stereotyped her father in an extremely negative way” and “she would be fine if he would drop off the face of the earth.” In consideration of the signs of parental alienation in this case and in light of “the literature in dealing with alienated children,” Dr. Pel-legrin stated that “generally speaking, the remedy is to remove the child from the alienating parent and place them with the parent from whom | ^they’ve been alienated, at least for a period of time until there can be some re-equilibrium established before there is a lot of contact with the other parent.”
Dr. Pellegrin speculated that “[i]f six years ago the recommendations had been put in place, maybe we wouldn’t be sitting here today;” but she did not believe that those recommendations could be- implemented effectively at this point because the alienation had only become worse. “[A]s I understand it, there was no such [reconciliation] counseling, and visitation became extremely irregular, which only serves, in the case of an alienated child, to reinforce that notion of that negative stereotype of a parent.” Consequently, Dr. Pellegrin .stated her belief that drastic measures were called for in this case.
Then, Dr. Pellegrin added that she was disturbed by an interaction she had with L.J. in the courtroom just before the hearing. According to Dr, Pellegrin, L.J. came and sat next to her in the courtroom; L.J. was crying and said, “[t]he‘ attorneys tell me: that you said I wanted' to go live with my dad — with Jacob Johnson,” and the only reason she was going to' see him was to keep her mother from going to jail. Dr, Pellegrin stated that she tried to explain to L.J. that she knew L.J. did not want to go live with her father but that she was making recommendations that hopefully L.J. would come to understand later. After describing the interaction, Dr. Pellegrin told the trial court that “the fact that the child is here and came and sat next to me and said these things to me really concerns me, ... that is the kind of thing that has led me to my conclusions.”
| |70n cross-examination, Dr. Pellegrin admitted that, to her knowledge, Mr. Johnson had not pursued reunification therapy with L.J., as recommended within the 2009 custody evaluation. She stated that she did not know the exact-reasons that therapy was not pursued. Dr. Pelleg-rin stated her understanding that regular visitation had not occurred over the last six years, at least not until within the last year; and Mr. Johnson had told her that he did not have enough time with L.J. for reunification therapy to take place. When asked if she had any information that Ms. Hilkirk had denied visitation in the -last three years, Dr. Pellegrin • responded, “[according to Mr. Johnson, she has. *742 That’s according to Mr. Johnson. I can’t — I don’t have documentation to support that.” However, she also expressed her-belief that L.J. would still be alienated even if there was regular visitation with her father..
Dr. Pellegrin was asked to describe some of' L.J.’s specific complaints about Mr. Johnso,n and Dr. Pellegrin offered two examples of incidents of which L.J. had complained. During a weekend visitation with Mr. Johnson that coincided with her half-sister’s (F.T.J.) visitation, L.J. claimed that her father forced her sister to stand in a corner for several hours, did not allow her to change her sanitary napkin, and was then beaten and choked by him. When Dr. Pellegrin asked Mr. Johnson about this incident, he related that the two girls had been caught shoplifting at a store and given punishment work; while L.J. complied, F.T.J. refused; at that point, he made F.T.J. stand in the corner and when she refused to stay in the corner, he turned her back towards the corner, and when she again did not listen to him, “she was indeed spanked.” Regarding the second incident, Dr. Pellegrin stated that lisduring a different visitation, L.J. had an altercation with her father. From her discussions with L.J., Mr. Johnson, and Mr. Johnson’s wife, Dr. Pellegrin ascertained the following: L.J. was in her room, wearing a towel, when' Mr. Johnson entered her room and started arguing with her about her cell phone; L.J. stated she felt uncomfortable because she was not fully dressed and asked him to leave but he refused; he then attempted to take her phone away from her; then, “[s]ome kind of physical altercation ensues where she admittedly is kicking and punching him. He — somehow she ends up against the wall as he!s trying to get the phone.- Her step mom comes in, kind of tells them to settle down. Mr. Johnson leaves, and Mrs. Johnson talks to [L.J.]”
When asked whether L.J. told Dr. Pel-legrin that her father has anger issues, Dr. Pellegrin responded that L.J. believes that he does and she has said that, but Dr. Pellegrin “did not find compelling evidence that Mr. Johnson has an anger problem.” However, Dr. Pellegrin acknowledged that Mr. Johnson does likely get angry because “it is very anger-provoking when a teenager is disrespectful and refuses to do what you ask her to do — ” Regardless, Dr. Pellegrin believed that Mr. Johnson’s possible anger issues are mutually exclusive from the alienation at issue here, because L.J.’s - animosity is disproportionate to whatever occurred.
In discussing Dr. Pellegrin’s recommendation for an immediate change of custody, including LJ.’s immediate removal from her current high school, Dr. Pellegrin acknowledged that L. J. was doing well in her current .school and described her as “a bright child.” Dr. Pellegrin stated that L.J. clearly expressed h3that she did not want to leave her current school and, therefore, Dr. Pellegrin .was also recommending immediate therapy “to try and ameliorate whatever negative reaction that will result from this.” To her knowledge, Dr. Pellegrin stated that L.J. was currently very active in athletics, but stated she would be surprised if Mr. Johnson had ever been to one of L.J.’s volleyball games ' because he lives in Mississippi and is not apprised of her schedule of activities. However, Dr. Pellegrin stated that Mr. Johnson and his wife gave assurances that L.J. would be given the opportunity to participate in activities in Mississippi, “all of the things she’s able to do here.”
On re-direct, Dr. Pellegrin was asked to elaborate on her- recommendation for an immediate change of custody that day. She stated it was her belief that, if the trial court were to take the matter under *743 advisement and delay a ruling, then L.J. would return home with her mother and be apprised of everything that went on in court that day; as a result, L.J.’s feelings would harden toward her father. Dr. Pel-legrin speculated that, “[L.J.] might feel that she’s backed into a corner somehow and that — I don’t know what could happen. She might start acting out.” Dr. Pellegrin then stated that psychologically L.J. is very distressed about the idea that she may be placed in the custody of her father due to the extremely negative view that she has of him.

Mr. Johnson’s Testimony

. Mr. Johnson testified that when Dr. Pel-legrin made the recommendation for reunification therapy in 2009 he did not have visitation with L.J. in order to pursue | gpreunification therapy. When asked if he ever inquired of Ms. Hilkirk about reunification therapy, Mr. Johnson responded, “I had no communication with Ms. Hilkirk, nor do I now. I don’t even have her phone number, so there’s no way for me to even contact her.”
Mr. Johnson stated that his visitation with L.J. in 2013 could be “loosely defined as a regular basis;” with further questioning, he stated that “about 80 percent” of visitations occurred in 2013. He stated that those visitations went well and L.J, did not have any behavioral or discipline problems, unlike he experienced with his other daughter, F.T.J. Regarding the suspension of his visitation with F.T.J., Mr. Johnson stated that he had not seen her since February 2014, following the incident in which he had disciplined her for shoplifting. He acknowledged that the Mississippi court ordered him to have a psychological evaluation; he stated his intention to have one completed before the March 16, 2015 hearing in the Mississippi court.
When asked whether he had spoken with L.J. about moving to live with him, Mr. Johnson stated that he had discussed it with her and that L.J. told him she likes her current school and does not want to be away from her friends. Mr. Johnson also stated that he was not privy to information about whether she was doing well in school except that L.J. said she was “doing great.” He added that L.J. is not very forthcoming with her emotions about , the situation. However, Mr. Johnson explained that he believed that it would be in L.J.’s best interest to immediately move to live with him, stating:
J^j[A]t my house I donlt think that she will be berated for having a good time or to love another parent, which I believe she’s receiving now. I also am not going to alienate her from her other parent. I am going to want what’s best for my daughter, not for myself. I want to encourage her to grow. I want her to live up to her full potential.
Counsel asked Mr. Johnson to explain how he knows that “someone berates her from being with you?” In response, Mr. Johnson described that L.J. is very quiet and timid for the first 30 minutes of every visit with him; then' she has a great time with everyone during the rest of the visit, but becomes quiet again about 15 minutes before she leaves to go home. “[Y]ou can see where if she doesn’t feel like she’s portraying a certain attitude about me, it seems as if that she’s basically reprimanded for it.” In regards to what he believed Ms, Hilkirk was “doing wrong” in this custody arrangement, Mr. - Johnson stated that Ms. Hilkirk was denying visitation “any chance she can get,” but he acknowledged that she has not done so within the last year.

Ms. Hilkirk’s Testimony

Ms. Hilkirk testified that she has raised L.J. her entire life and currently L.J. lives with her, her husband, and her two other *744 children. According to Ms. Hilkirk, L.J. does well in school, has many Mends, and likes to participate in volleyball and softball. However, Ms. Hilkirk stated that L.J. has not been on the school teams for sports in the last year and a half because the tryouts and practices conflicted with the visitations with Mr. Johnson. Therefore, Ms. Hilkirk stated she would like the court to modify the visitations in some way to allow for L.J. to participate in sports teams without reducing the time her father sees her.
|22Regarding the Mississippi custody case with Mr. Johnson and his other daughter, Ms. Hilkirk stated that she was concerned about that situation and the allegations involved. Ms. Hilkirk also claimed that Mr. Johnson had been “very abusive” towards her during their relationship. Along with that concern, Ms. Hil-kirk stated that L.J. becomes very upset before every visit with her father and does not enjoy the visits. Nonetheless, Ms. Hil-kirk insists that L.J. goes on the visits in compliance with what the trial court has ordered. She agreed that she would continue to allow the visitation and agree to more visitation for Mr. Johnson if he completes the psychological examination and the Mississippi court “clears him” to restore the visitation with F.T.J.
On cross-examination, Ms. Hilkirk testified that she had to force L.J. to visit with her father because L.J. did not want to go. She alleged that Mr. Johnson does not feed her correctly while she’s there and stated that L.J. has Graves’ disease which requires L.J. to eat regularly. Ms. Hilkirk stated that she does not believe that she has alienated L.J. from Mr. Johnson and that she has not denied him visitation, except for a few times, since 2012. Ms. Hilkirk admitted that she does not inform him of L.J.’s school activities and does not communicate with him directly; however, she stated that L.J. has a cell phone with which she communicates with her father.
At the conclusion of testimony, the trial court accepted brief arguments from counsel. Mr. Johnson’s counsel did not offer any argument with regard to Mr. Johnson’s motion to modify custody; his counsel only addressed two outstanding 12Srules for contempt regarding attorney’s fees and the cost of the custody evaluation. Ms. Hilkirk’s counsel addressed the cross-motions to modify custody. He argued that the testimony from both parents established that L.J. is a well-adjusted, happy, 14-year-old girl with a stable environment at home with her mother; visits with her father have gone well generally, aside from incidents related by Dr. Pellegrin and Mr. Johnson. While acknowledging that Ms. Hilkirk and Mr. Johnson do not have a good relationship, counsel argued that L.J. has been able to adjust well and continues to do well in school. Counsel also stated that Ms. Hilkirk would not object to expanded periods of custody with Mr. Johnson provided that he comply with the orders of the court in Mississippi to undergo a psychological examination. Finally, Ms. Hilkirk’s counsel asked that the court defer any modification of custody of L.J. pending the outcome of a March 2015 court hearing in the Mississippi custody matter regarding Mr. Johnson’s other daughter.
The trial court took a brief recess before rendering judgment that day. In stating its findings, the trial court discussed only Dr. Pellegrin’s testimony. The trial court agreed with Dr. Pellegrin’s assessment that this case involved parental alienation. The trial court stated that, “[t]he level of parental alienation in this case exhibited by [Ms, Hilkirk] against Mr. Johnson as it pertains to [L.J.] is one of the worst this Court has seen.” The trial court was “appalled that this minor child came to sit *745 next to Dr. Pellegrin” before the hearing to “discuss the case” and believed this was due to the parental alienation. The trial court also found it “very upsetting” that L.J. refers to her father “by his name, and not ‘father’ or ‘dad’ or 1 ^daddy’ ” and considered this to be another sign of parental alienation. The trial court then noted Dr. Pellegrin’s concern that if the trial court took the custody matter under advisement and L.J. went home with her mother following the hearing “it would cause further turmoil to the child” and that the Mississippi court case posed an “opportunistic situation” for Ms. Hilkirk.
Based on the trial court’s assessment of Dr. Pellegrin’s testimony and recommendations, the trial court rendered judgment in favor of Mr. Johnson, stating as follows:
The Court finds that it is in the best interest of the minor child to change custody immediately. It would be harmful and deleterious to the child to continue in the present custody with her mother, such that the Court finds it is necessary to remove her immediately from the environment to which she is accustomed to living in with her mother. The Court is going to change custody today from [Ms. Hilkirk] to Mr. Johnson. Mr. Johnson will now be the domiciliary parent.
As suggested by — or recommended by Dr. Pellegrin, there will be no contact with [Ms. Hilkirk] for the first two months. So, from today’s date for the first two months there will be no contact.
For the third and fourth months, [Ms. Hilkirk] may have phone contact with the minor child twice a week for a period not to exceed 20 minutes.
On the fifth and sixth month, [Ms. Hil-kirk] may have facetime with her child every other weekend on Saturday for one hour.
[[Image here]]
On the seventh month the minor child may have alternating weekend visits with her mother from Friday at 6:00 to Sunday at 6:00 p.m.
[[Image here]]
After one year, the holiday and summer schedule that the father had previously shall become that of [Ms. Hilkirk],
The minor child shall change schools immediately.
To facilitate the immediate transfer of custody, the trial court prepared an order directing the St. Tammany Sheriffs Department to accompany Mr. Johnson to gather all of L.J.’s belongings, including her social security card and birth certificate, from her mother’s house that evening. The trial court then ordered Mr. LüJohnson’s counsel to prepare the judgment, which was submitted and signed by the trial court on March 3,2015.
Ms. Hilkirk timely filed a motion for new trial on March 6, 2015, which was denied by the trial court on April 2, 2015.[13] Ms. Hilkirk then timely filed the instant appeal of the trial court’s March 3, 2015 judgment ordering an immediate change in custody of L.J., from joint custody with Ms. Hilkirk as domiciliary parent to sole custody in Mr. Johnson with limited visitation rights for Ms. Hilkirk.
*746 STANDARD OF REVIEW
“Every child custody case must be viewed based on its own particular facts and relationships involved, with the goal of determining what is in the best interest of the child.” Mulkey, 12-2709, p. 15, 118 So.3d at 367. Child custody determinations made by the trial court are entitled to great weight and, upon appellate review, that determination will not be disturbed absent a clear showing of abuse of discretion. Foshee v. Foshee, 12-1358, p. 4 (La.App. 4 Cir. 8/28/13), 123 So.3d 817, 820 (citing McKenzie v. Cuccia, 04-0112, pp. 3-4 (La.App. 4 Cir. 6/23/04), 879 So.2d 335, 338); Orrill v. Orrill, 08-0400, p. 3 (La. App. 4 Cir. 2/4/09), 5 So.3d 279, 281.
In most child custody cases, the trial court’s determination is based heavily on factual findings. See Mulkey, 12-2709, pp. 16-17, 118 So.3d at 368; Palazzolo v. Mire, 08-0075, p. 34 (La.App. 4 Cir. 1/7/09), 10 So.3d 748, 768. On appellate 12f!review, a trial court’s factual findings cannot be set aside absent manifest error. Rosell v. ESCO, 549 So.2d 840, 844 (La.1989). If, upon review of the record, the appellate court finds no reasonable factual basis for the trial court’s finding or the record establishes that the finding is clearly wrong, then the appellate court shall set aside the trial court’s finding. Watts v. Watts, 08-0834, pp. 2-3 (La.App. 4 Cir. 4/8/09), 10 So.3d 855, 857-58; Mart v. Hill, 505 So.2d 1120, 1127 (La.1987). When the appellate court finds that one or more legal errors interdict the trial court’s fact-finding process, the manifest error standard of review is no longer applicable. Evans v. Lungrin, 97-0541, pp. 6-7 (La.2/6/98), 708 So.2d 731, 735. A legal error occurs when the trial court applies incorrect principles of law; such errors are prejudicial when they materially affect the outcome and deprive a, party of substantial rights. Id. Where prejudicial error of law skews the trial court’s finding of a material issue of fact, the appellate court is required, if presented with a complete record, to determine the essential material facts de novo and render a judgment on the merits. Id., p. 7, 708 So.2d at 735; see also Rosell, 549 So.2d at 844, n, 2.
DISCUSSION
“The primary consideration in a determination of child custody is the best interest of the child.” Mulkey, 12-2709, pp. 9-10, 118 So.3d at 364; La. C.C. art. 131. If the parents come to an agreement on who is to have ’ custody, then the trial court must award custody in accordance with that agreement unless the best interest of the child requires a different award. La. C.C. art. 132.. If there is no |27agreement, or if the agreement is not in the best interest of the child, then the trial court shall award joint custody unless custody ip one parent is shown by clear and convincing evidence to be in the best interest o'f the child. Id. The clear and convincing standard is a heavier evidentiary burden than preponderance of the evidence; to prove by clear and convincing evidence means to present “evidence' indicating that the thing to be proved is highly probable or reasonably certain.” Palazzolo, 08-0075, p. 36, 10 So.3d at 769 (quoting Bryan A. Garner, Black’s Law Dictionary, 596 (8th ed.2004)); see Griffith v. Latiolais, 10-0754, p. 18 (La.10/19/10) 48 So.3d 1058, 1070.
Under prior law, former La. C.C. art. 131 established a rebuttable presumption favoring joint custody, and courts imposed the burden on the party seeking sole custody to prove that joint custody was not in the best interest of the child. Palazzolo, 08-0075, p. 36, 10 So.3d at 769. However, under current law and jurisprudence, the burden has shifted from a negative to a positive by requiring a party seeking sole *747 custody to demonstrate that the granting of custody to that party alone is in the best interest of the child. Id.
The burden of proof on a party seeking to modify a prior custody award is dependent on the nature of the underlying custody award. Custody awards are commonly of two types: a stipulated or consent judgment by which the parties agree to the custodial arrangement; or a considered decree, wherein the trial court receives and considers evidence of parental fitness to exercise care and custody of the child. See Cherry v. Cherry, 04-0002, p. 5 (La.App. 4 Cir. 2/2/05), 894 So.2d 1208, 1212; Mimms v. Brown, 02-1681, p. 10 (La.App. 4 Cir. 9/3/03), 856 So.2d 36, 42; Evans, pp. 12-13, 708 So.2d at 738.
When the trial court has made a considered decree awarding custody, the party seeking to modify that custody award bears a heavy burden of proof to warrant a change in the considered decree. Bergeron, 492 So.2d at 1196; see Mulkey, 12-1709, pp. 9-10, 118 So.3d at 364; Cherry, 04-0002, p. 5, 894 So.2d at 1212. In Bergeron, the Louisiana Supreme Court explained the need for the heavy burden of proof in custody modification cases, stating, “[t]he child has at stake an interest of transcending value in a custody modification suit — his best interest and welfare— which may be irreparably • damaged not only by a mistaken change in custody but also by the effects of an attempted or threatened change of custody on grounds that are less than imperative.” 492 So.2d at 1200. In consideration of the prior rule in modification cases that the party seeking a change in custody must prove the continuation of the' present custody is so deleterious to the child as to justify removal from the environment to which the child is accustomed, the Court recognized that “in a narrow class of cases a modification of custody may be in the child’s best interest even though the moving party is unable to show that the present custody is deleterious to the child.” Id. The Court thus concluded,
[I]n order to protect children from the detrimental effects of too liberal standards in custody change cases, the burden of proof should be heavy and the showing of overall or net benefit to the child must be clear. To accommodate these interests, the burden of proof rule should be restated as follows: When a trial court has made a considered decree of permanent custody the party seeking a change bears a heavy burden of proving that the continuation of the present custody is so deleterious to the child as to justify a modification of the custody decree, or of proving by clear and convincing evidence |?.gthat the harm likely to be caused by a change of environment is substantially outweighed-by its advantages to the child.
Bergeron, 492 So.2d at 1200. As restated more recently by the Louisiana Supreme Court in Mulkey,
Thus, when a party seeks to change custody rendered in a considered decree, the proponent of change must not only show that a change in circumstances' materially affecting the welfare of the child has occurred since the prior order respecting custody, but he or she must also meet the burden of proof set forth in Bergeron, (emphasis added)
12-2709, p. 11, 118 So.3d at 365.
In the instant case, the parties do not dispute that the July 31, 2012 joint custody award was a considered decree. At the February 27, 2015 hearing, both parties had motions to modify before the court: Ms. Hilkirk sought to modify Mr. Johnson’s visitation; and Mr. Johnson sought a change in custody from joint custody to sole custody of L.J. with him. By seeking the change in custody from the considered *748 decree, Mr. Johnson bore the heavy burden of proof as enunciated in Bergeron: that there had been a material change in circumstances since the July 31, 2012 considered decree, such that the continuation of joint custody was so deleterious to L.J. as to justify her immediate removal from the environment to which she was accustomed; or of proving by clear and convincing evidence that the harm likely to be caused by the immediate change of L.J.’s environment would be substantially outweighed by its advantages to her..
In the sole assignment of error on appeal, Ms. Hilkirk argues that the trial court manifestly erred by finding that Mr. Johnson met the applicable burden of proof warranting a change in custody and ordering strict limitations on Ms. |snHilkirk’s contact and visitation with L.J. Ms. Hilkirk contends that the trial court ignored the relevant factors for determining the child’s best interest, as set forth within La. C.C. art. 134, and erred in finding that the record established by clear and convincing evidence that sole custody to one parent was in the best interest of the child, in accordance with La. C.C. art. 132. After our review of the entire record, we find that Mr. Johnson failed to meet the heavy burden of proof required by Bergeron. Moreover, the record does not establish by clear and convincing evidence that the advantages of the change in custody would substantially outweigh the harm likely to be caused by the change, such that it is in the best interest of the child.
Initially, we note that Mr. Johnson relied solely on Dr. Pellegrin’s testimony to establish the heavy burden of proof necessary to warrant the change in custody. In support of his motion to modify custody, he called Dr. Pellegrin as his only witness, introduced no other evidence, and his counsel offered no argument in support of the motion. However, Ms. Hilkirk’s counsel called Mr. Johnson and Ms. Hilkirk to testify at the hearing and introduced court documents from the Mississippi custody case in which Mr. Johnson’s visitation had been suspended.[14] In our review of the entire record, we consider all of the testimony and evidence presented to the trial court in this matter.
| ^Testimony from all three witnesses establishes that Ms. Hilkirk and Mr. Johnson have an antagonistic relationship; both parents testified that they do not communicate with one another about L.J. Although the record indicates that Mr. Johnson had regular visitation with L.J. from her birth until she was four years old, there is conflicting testimony regarding Mr. Johnson’s lack of contact with L.J. from 2005 until March 18, 2008, when his visitation was suspended pending the completion of the original custody evaluation.
According to Dr. Pellegrin’s testimony regarding the original custody evaluation, L.J. was already alienated from her father in 2009 due to the lack of contact with him for several years; therefore, she recommended that reunification therapy and gradual visitation be implemented. Following the completion of the custody evaluation, the record reflects that Dr. Pellegrin was appointed as a continuing facilitator in this custody matter on September 25, 2009; but there is no order or judgment from the trial court implementing any of the custody recommendations.
According to testimony from Mr. Johnson and Ms. Hilkirk, reunification therapy was not pursued voluntarily by either par *749 ty.[15] In regards to visitation, the record does not indicate that any action was taken to reestablish Mr. Johnson’s visitation pri- or to May 2, 2012, when he filed a motion to reset with incorporated petition for custody and visitation. Thus, the record establishes that Mr. Johnson’s ^visitation with L.J. was suspended from March 18, 2008 until July 31, 2012 at which time the trial court rendered the joint custody award. In the first year following the joint custody award, Mr. Johnson testified that Ms. Hilkirk thwarted his attempts to exercise regular visitation with L.J.; then, in 2013, his visitations occurred about 80 percent of the time; and in 2014, his visitation with L.J. occurred regularly every other weekend.[16]
Although regular visitation by L.J. and Mr. Johnson was occurring at the time Dr. Pellegrin conducted her reevaluation in 2014, Dr. Pellegrin testified that, due to the lack of counseling and irregular visitation between 2009 and 2014, L.J. had become more alienated from her father and viewed her father in exclusively negative terms. In consideration that six years had passed since the original custody evaluation, Dr. Pellegrin believed that implementing the 2009 recommendations would not alleviate the level of parental alienation exhibited in this case. She testified that even with regular, even increased, visitation L.J. would continue to be alienated from her father and not be able to have a healthy, positive relationship with him. Based on “all of the literature in dealing with alienated children,” Dr. Pellegrin testified that the recommended remedy is to remove the child from the alienating parent — Ms. Hilkirk — and place the child with the alienated parent — Mr. Johnson — for a period of time “until there can be some re-equilibrium established.” According to Dr. Pellegrin, the .drastic remedy of an [-¡.¡immediate change in custody would be the only way for L.J. to “come to understand that it’s okay to have a relationship with her father.”
Regarding L.J.’s current well-being and environment, all three witnesses testified that L.J. was doing well in school, she did not have any disciplinary problems, she had many friends, she enjoyed participating in athletics, and she did not have any behavioral or psychological problems — other than the negative emotions expressed regarding her father. The testimony from Dr. Pellegrin and Mr. Johnson also established that L.J. did not want to relocate and was very distressed about the possibility of being placed in the custody of Mr. Johnson. Dr. Pellegrin testified that L.J. would need immediate therapy to adjust to the custody change “to try and ameliorate whatever negative reaction that will result from this [custody change].”
As to the advantages of a change in custody, Dr. Pellegrin testified that L.J. would be placed in a good school, be allowed to participate in athletics, and do “all of the things that she’s able to do here.” Mr. Johnson’s testimony did not offer any specific advantages to the change in custody other than his statement that he *750 would not berate L.J. and alienate her from her other parent. When asked what Ms. Hilkirk was doing wrong in the current situation, Mr. Johnson stated that she was denying visitation every chance she could; but he acknowledged that Ms. Hil-kirk had not recently denied visitation.
At the conclusion of the hearing, the trial court found Dr. Pellegriris testimony sufficient to satisfy Mr. Johnson’s heavy burden of proof to warrant the 134change in custody. The trial court agreed with Dr. Pellegrin’s assessment that this case involved parental alienation. As examples of parental alienation, the trial court cited the fact that L.J. refers to her father by his name rather than “father” or “dad,” and the fact that L.J. approached Dr. Pellegrin in the courtroom to discuss the case. The trial court also echoed Dr. Pellegrin’s concern that if the matter was taken under advisement and L.J. returned home with her mother, then “it would cause further turmoil to the child.” Based on Dr. Pel-legriris testimony, the trial court found that it would be harmful and deleterious for L.J. to remain in the custody of her mother and it was in L.J.’s best interest to immediately remove her from the environment to which she is accustomed and place her in the sole custody of Mr. Johnson.
After our thorough review of the record, we find insufficient evidence to support the trial court's finding that Mr. Johnson met the required burden of proof, as set forth in Bergeron, to warrant the immediate change in custody. The record does not establish that there had been a material change of circumstances since the considered decree such that the continuation of joint.custody would be harmful or deleterious to L.J. Although Dr. Pellegrin stated that if L.J. returned home with her mother then she “might start acting out” and “there might be more resistance to visiting her father,” the testimony from Mr. Johnson established that L.J.’s visits with him in the last year had occurred regularly and gone well; there was no testimony that L.J. was having any particular difficulty adjusting to the visitation. In addition, we find no evidence in the record to establish that the harm likely to be |3Bcaused by immediate removal and relocation of L.J. would be substantially outweighed by its advantages to L.J. To the contrary, Dr. Pellegrin acknowledged that L.J. would react negatively to the change in custody and, therefore, would require immediate therapy. The testimony from Dr. Pelleg-rin and Mr. Johnson offers little clarity on whether or how an immediate change in custody would benefit L.J.
As to the trial court’s finding that this case involves parental alienation, this Court recognizes that parental alienation is a relevant concept that relates to certain factors for determining the best interest of the child in child custody cases,[17] specifically La. C.C. art. 134(6) *751 regarding the moral fitness of each party and (10) regarding the willingness and ability of each party to facilitate a relationship between the child and the other party. See Palazzolo, 08-0075, pp. 46-47, 10 So.3d at 775. However, in the instant case, the record as a whole does not present clear and convincing evidence that the immediate change of custody and relocation of L.J. is in the best interest of the child. See La. C.C. 132; see generally, Griffith, 10-0754, p. 18, 48 So.3d at 1070-1071 (finding that the record did not present clear and convincing evidence that sole custody was in the child’s best interest, and [.^stating '“[t]he clear and convincing standard requires a party to prove the existence of a contested' fact is highly probable, or much more probable than its nonexistence.”). Thus, we find the trial court manifestly erred in granting the change from joint custody, as awarded in a considered decree, to sole custody of L.J. to Mr. Johnson. Consequently, we review the record de novo to determine whether there is sufficient evidence to render a final judgment on the merits.[18] ‘
The best interest of the child standard, mandated by La. C.C. arts. 132 and 134, is a,“fact-intensive inquiry requiring the weighing and balancing of factors favoring or opposing custody in the competing parties on the basis of the evidence presented.” , Lannes v. Lannes, 07-0345, p. 4 (La.App. 4 Cir. 2/13/08), 977 So.2d 1119, 1121. La. C.C. art. 134 sets forth a list of twelve factors that the trial court shall consider in determining the best interests of the child:
(1) The love¡ affection, and other emotional ties between each party and the child.
(2) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.
Iar(3) The capacity and disposition of each party to * provide the child with food, clothing, medical care, and other material needs,
(4) The length of time the child has lived in a stable environment, and the desirability of maintaining continuity of . that environment.
(5) The permanence, as. a family unit, of the existing or proposed custodial home or homes, ; ■
(6) The moral fitness of each party, insofar as it affects the welfare of the child.
(7) The mental and physical health of each party.
(8) The home, school, and community history of the child.
(9) The. reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.
(10) The willingness and ability of each party to facilitate and encourage a close *752 and continuing relationship between the child and the other party.
(11) The distance between the respective residences of the parties;
(12) The responsibility for the care and rearing of the child previously exercised by each party.
We recognize that these twelve factors are considered to be illustrative and nonexclusive, and the trial court has the discretion to determine the relative amount of weight to give each factor. Hanks v. Hanks, 13-1442, p. 9 (La.App. 4 Cir. 4/16/14), 140 So.3d 208, 215 (citing Palazzolo, 08-0075, pp. 34-37, 10 So.3d at 768-770). “The court is not required to analyze mechanically all of the dozen factors; rather the court should balance and weigh the factors in view of the evidence presented.” Id.
In this case, the trial court did not mention any of the twelve factors within La. C.C. art. 134 for determining the best interest of the child. However, as stated above, this Court recognizes that two of the La. C.C. art. 134 factors relate to Issparental alienation, which the trial court found to be the determinative fact. See Palazzolo, swpra. We will address those factors first.
Factor (6) relates to “the moral fitness of each party, insofar as it affects the welfare of the child;” it “comes into play because moral fitness includes a parent’s attitude toward the other parent.” Palazzolo, 08-0075, p. 46, 10 So.3d at 775 (citing Goodwin v. Goodwin, 618 So.2d 579, 586 (La.App. 2nd Cir.1993)). Here, Dr. Pel-legrin’s testimony suggests that L.J.’s negative view of her father developed and hardened over time due to Ms. Hilkirk’s influence. Mr. Johnson stated that Ms. Hilkirk berates L.J. for loving her other parent. Although there is no direct evidence that Ms. Hilkirk has any psychological or behavioral problems that would compromise her moral fitness as a parent,[19] a reasonable interpretation of the testimony would be that Ms. Hilkirk’s negative and hostile attitude towards Mr. Johnson has caused or contributed to L.J.’s negative view and alienation from Mr. Johnson. Therefore, we find this factor, as it relates to parental alienation, weighs in favor of Mr. Johnson. However, Ms. Hilkirk raised the issue before the trial court that Mr. Johnson’s visitation with his other daughter, F.T.J., was suspended by a Mississippi court pending the completion of a psychological evaluation and a hearing on the issue. We note that Dr. Pellegrin testified that the outcome of that custody/visitation case would be a relevant consideration for this custody matter if the Mississippi court were to rule against Mr. Johnson. We agree that an order or | judgment ruling against Mr. Johnson’s visitation or custody rights concerning his other child, with whom L.J. has developed a relationship, is a relevant and important consideration as to Mr. Johnson’s moral fitness as a parent insofar as it affects the welfare of L.J. Consequently, the record before us does not provide sufficient information to determine this factor in favor of one parent over the other parent.
Factor (10) is “[t]he willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.” *753 La. C.C. art. 134. The record of this custody matter indicates that Ms. Hilkirk denied Mr. Johnson’s visitation with L,J. several times since the considered decree was rendered on July 31, 2012; the trial court found her in contempt in two separate judgments, on May 10, 2013 and December 30, 2013, for failure to provide L.J. to Mr. Johnson for visitation. We also note that both parents testified that they had no communication with the other parent concerning L.J. L.J. has a cell phone and would communicate with each parent directly. It is also evident from their testimony that neither parent has a positive view or attitude towards the other; each has alleged abusive behavior by the other during their short-lived relationship. However, in consideration of Ms. Hilkirk’s actions in denying visitation in the past and the trial court’s finding that Ms. Hil-kirk contributed to L.J.’s alienation from her father, we find that this factor also weighs in favor of Mr. Johnson.[20] We now turn to consider the other ten factors of La. C.C. art. 134.
| .inFrom our review of the record before us, we find sufficient evidence to establish that La. C.C. art. 134 factors (1), (4), (8), and (12) weigh in favor of Ms. Hilkirk. Factor (1) concerns the love, affection, and other emotional ties between each party and the child. The record establishes that L.J. has a very close and strong emotional tie with her mother with whom L.J. has lived her entire life. In contrast, according to Dr. Pellegrin, L.J. views her father in exclusively negative terms and does not have a healthy, positive relationship with him. Although we recognize that Dr. Pel-legrin and the trial court found that Ms. Hilkirk contributed to the alienation of L.J. from her father, the record establishes that L.J. has a significantly closer relationship with Ms. Hilkirk, weighing this factor in Ms. Hilkirk’s favor.
Factor (4) considers the length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity and stability. “Stability of environment is an important factor to be taken into account in considering changes in custody. A change from a stable environment should not be made absent a compelling reason.” Lee v. Lee, 34,025, p. 9 (La.App. 2 Cir. 8/25/00), 766 So.2d 723, 728. Factor (8) is the home, school, and community history of the child; and factor (12) is the responsibility for the care and rearing of the child previously exercised by each party. All three witnesses testified that L.J. did well at home and in school and that she enjoyed participating in athletics and being near her friends. Although Mr. Johnson testified that L.J. had good visits |41with him and got along well with his family, his and Dr. Pellegrin’s testimony also clearly establishes that L.J. was distressed about the possibility of being removed from her home and school environment and leaving her mother and friends. Despite Dr. Pellegrin’s testimony that the immediate change in custody was necessary for L.J. to “come to understand that it’s okay to have a relationship with her father,” we do not find that to be a compelling reason to justify the immediate removal and relocation of L.J. from the stable home and school environment she had known her entire life. Thus, we find factors (4), (8), and (12) weigh in favor of maintaining L.J. in the home environment to which she was accustomed with her mother. Also, in consideration of L.J.’s ties to her home and community in Slidell, *754 Louisiana, we find that factor (11), “the distance between the respective residences of the parties,” also weighs in favor of maintaining L.J.’s residence with Ms. Hil-kirk rather than relocating her to 'Gautier, Mississippi, which is approximately two hours away.
In reviewing the other factors in light of the record before us, we find factors (2), (3), (5), and (7) are neutral, in that none weighs particularly in favor of either Ms. Hilkirk or Mr. Johnson. As to factors (2) and (3), both parents have established that they are capable of providing L.J. with love, affection, a good education, and all of her basic and material needs. In fact, Dr. Pellegrin testified that Mr. Johnson and his wife would be able to provide all of the things that L.J. has at home with Ms. Hilkirk. Other than Ms. Hilkirk’s statement that L.J. has Graves’ disease and must be fed properly, there was no evidence to suggest that |4i>L.J. would not be properly cared for in either home. As to factor (5), the permanence of the family unit in each home was not called into doubt by the testimony or evidence presented. As to factor (7), Dr.. Pellegrin’s 2009 custody evaluation noted no mental or physical health problems with either parent; and she testified that she did not find any reason to conduct any further psychological evaluations during the reevaluation in 2014. There is no evidence to indicate that either Ms. Hilkirk or Mr. Johnson has any mental or physical health problem that interferes with her or his ability to parent. Thus, we find these four factors of La. C.C. art. 134 are neutral.
Finally, factor (9) is “the reasonable preference of the child, if the court deems the child to be of sufficient age to express .a preference.” At the time of the hearing, L.J. was fourteen years old. She was not called to testify by either party and .the trial court did not deem it necessary to hear L,J.’s preference. Nonetheless, the testimony from Dr. Pellegrin and both parties establishes that L.J. had expressed her preference to remain with her mother.
Considering all of the factors set forth in La. C.C. art. 134 in light of the record before us, we find insufficient evidence to conclude that a change in custody from joint custody to sole custody of L.J. with Mr. Johnson was in LJ.’s best interest. Therefore, in accordance with La. C.C. art. 132, we find that joint custody of L.J. is in the child’s best interest and we reverse the trial court’s judgment granting sole custody of L.J. to Mr. Johnson.
|43We recognize, however, that L.J. has been in the custody of Mr. Johnson since the date of the hearing on February 27, 2015. In consideration that L.J. has been in a different home and school environment to which she may have grown accustomed, we cannot determine from the record before us whether the present facts and circumstances weigh in favor of once again removing and relocating L.J. from her present environment to return to the physical custody of Ms. Hilkirk. Consequently, we remand this matter to the trial court for further proceedings consistent with this Court’s decision that joint, custody is in the best interest of L.J.; the trial court shall take further evidence and testimony to determine whether the present facts and circumstances — including the status of Mr. Johnson’s custody/visitation with his other daughter in Mississippi and L.J.’s current preference[21] — weigh in favor of maintaining L.J. in the physical *755 custody of Mr. Johnson or returning L.J. to the physical custody of Ms. Hilkirk. The trial court’s determination may or may not designate a domiciliary parent; however, the trial court shall grant reasonable visitation to the non-custodial parent.
In regards to the strict limitations on Ms. Hilkirk’s contact and visitation with L.J., ordered by the ’trial court within its March 3, 2015 judgment, this Court finds the denial of visitation rights to a parent to be an extreme measure warranted only by “conclusive evidence that visitation would seriously endanger the child’s physical, mental, moral, or emotional health.” Palazsolo, 08-0075, p. 52, 10 So.3d at 778; see Becnel v. Becnel, 98-593, p. 5 (La.App. 5 Cir. 3/25/99), 732 So.2d 589, 592; Maxwell v. LeBlanc, 434 So.2d 375, 377 (La.1983). La. C.C. art. 136(A) provides that “[a] parent not granted custody or joint custody of a child is entitled to reasonable visitation rights unless the court finds, after a hearing, that visitation would not be in the best interest of the child.” “Under Article 136, the parent seeking to restrict or deny- access or visitation of the other parent to the child has the burden of proving that visitation would not be in the best interest of the child.” Palazsolo, 08-0075, p. 52, 10 So.3d at 778. This record does not provide any conclusive evidence that visitation by Ms. Hilkirk with L.J. would “seriously endanger” L.J.’s health or welfare. Although Dr. Pellegrin found that Ms. Hil-kirk’s influence had contributed to L.J.’s alienation from her father, she did not testify that Ms. Hilkirk presented a.danger to L.J. We do not find that Dr. Pelleg-rin’s testimony regarding the parental alienation in this case constitutes conclusive evidence that visitation would endanger L.J. or proves that visitation would not be in the best interest of the child, in accordance with La. C.C. arts. 132 and 136. While we recognize the trial court’s concern regarding Ms. Hilkirk’s actions and behavior in contributing to L.J.’s alienation from her father, we find the trial court erred in denying Ms. Hilkirk’s contact and visitation with L.J. for two months and strictly limiting their contact and visitation for several-months until one year from the date of the hearing.
Accordingly, on remand, the trial court shall reinstate contact and reasonable visitation between Ms. Hilkirk and L.J. as soon as practicable and. such visitation 1¿(¡shall continue until such time that the trial court conducts a hearing to determine if physical custody with Mr. Johnson or Ms. Hilkirk. is in the best interest of L.J.
CONCLUSION
For the foregoing reasons, we reverse the trial court’s March 3, 2015 judgment granting the change in custody from the considered joint custody decree to sole custody of L.J. with Mr. Johnson.: In addition, we reverse the trial court’s order denying or strictly limiting Ms. Hilkirk’s visitation with -L.J. We remand this matter to the trial court for a hearing-to determine physical custody of L.J., in accordance with the factors set forth in La. C.C. art. 132, and to "determine the reasonable visitation rights: of the non-custodial parent. '
REVERSED AND REMANDED
TOBIAS, J., concurs.
BONIN, J., dissents with reasons.
LEDET, J., concurs.

. Appellant will be referred to by her maiden name, though the Court notes that her name by marriage is Jeanne Hilkirk Laurente.

. 492 So.2d 1193 (La.1986).

. The trial court’s July 31, 2012 judgment did not designate a domiciliary parent. '

.The consent judgment was entered on the record in open court on March 23, 2001, and the judgment was signed on September 6, 2001. The consent judgment also specified that Mr. Johnson must contact Ms. Hilkirk prior to each visit to verify that he will be exercising visitation and that the parties would meet at the Racetrack Service Station in Slidell to exchange physical custody of L.J.

. La. R.S. 9:331 provides,
A. The court may order an evaluation of- a party or the child in a custody or visitation proceeding for good cause shown. The evaluation shall be made by a mental health professional selected by the parties or by the court. The court may render judgment for costs of the evaluation, or any part thereof, against any party or parties, as it may consider equitable.
B. The court may order , a party or the child to submit to and cooperate in the evaluation, testing, or interview by the mental health professional. The mental health professional shall provide the court and the parties with a written report. The mental health professional shall serve as the witness of the court, subject to cross-examination by a party.

. According to her curriculum vitae, Dr. Pel-legrin holds a Ph.D. in Clinical Psychology ■ and, at the time of the 2009 custody evaluation, was.the Director at Assessment an.d Psychological Services in Baton Rouge, Louisiana.

. Ms, Hilkirk filed a motion to terminate visitation on August 4, 2005.

. Dr. Pellegrin specifically recommended Allison Johnson, LPC, of Slidell, as the therapist.

. Dr. Pellegrin testified that after she submitted her original custody evaluation in 2009 she did not meet with the parties again until she was contacted to conduct the updated custody evaluation in 2014.

. The parties appeared before the trial court and entered into consent judgments on the record on the following-dates: October 12, 2012 (signed December 18, 2012); May 10, 2013 (signed June 13, 2013); June 13, 2014 (signed January 14, 2015); and July 8, 20Í4 (signed February 4, 2015). In addition, the trial court entered judgment on December 30, 2013, following a hearing on one of the rules for contempt filed by Mr. Johnson, and ordered specific holiday and summer visitation for Mr. Johnson with L.J.

. The updated custody evaluation was not offered or introduced into the record, during the February 27, 2015 hearing, and the record on appeal does not include a ,copy of the 2014 custody evaluation.

. The record before us includes a copy of a December 3, 2014 Temporary Order from the 2nd Judicial District Chancery Court of Harrison County, Mississippi, which orders the "continued suspension of the visitation” of Mr. Johnson with his daughter, F.T.J. "as previously ordered by the Harrison County Youth Court,” and finds that visitation should not be reinstated until such time that Mr. Johnson completes a psychological evaluation and petitions the court to reinstate his visitation.

. At the hearing on the motion for new trial, the trial court also denied Ms. Hilkirk’s motion for a stay of the March 3, 2015 judgment pending the outcome of this appeal. Ms. Hilkirk then filed an application for supervisory review of the trial court’s denial of the stay. In Hilkirk v. Johnson, unpub., 15-0474 (La.App. 4 Cir. 5/5/15), this Court declined to stay the March 3, 2015 judgment pending the appeal of this matter and denied the writ.

. Ms. Hilldrk's counsel presented the testimony of Mr. Johnson and Ms, Hilkirk to testify, introduced the Mississippi child custody case court documents, and argued to the trial court in support of Ms. Hilkirk’s motion to modify visitation.

. However, the record indicates that L.J. was engaged in therapy in 2013. A letter, dated August 19, 2013, from Andrea Kliebert, LPC, states that L.J. engaged in weekly therapy "to address anxiety pertaining to visits with her father.” Dr. Pellegrin testified that she spoke with L.J.'s therapist, Ms, Kliebert, while conducting the updated custody evaluation in 2014. Dr. Pellegrin did not offer any testimony regarding her conversation with L.J.’s therapist.

. The interim consent judgments entered on June 13, 2014 and July 8, 2014 also include provisions for Mr. Johnson to exercise two weeks of visitation in each of those months, followed by a return to every other weekend visitations.

. In Palazzolo, the concept of parental alienation was raised as a relevant consideration by two court-appointed psychologists/custody evaluators who both testified that tire case involved parental alienation and concluded that sole custody in one parent was warranted; however, the experts disagreed as to which parent should have sole custody. 08-0057, pp. 37-46, 10 So.3d at 770-775. After review and comparison of the concepts of parental alienation and Parental Alienation Syndrome, this Court concluded that two La. C.C. art. 134 factors relate to parental alienation. "Factor (6) comes into play because moral fitness includes a parent’s attitudes toward the other parent.... Factor (10) relates to '[t]he willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party.' ” Id. In reviewing the best interests of the child in that case, this Court weighed parental alienation in the context of those two factors and then considered the other ten factors. Id. 08-0075, pp. 46-47, 10 So.3d at 775.

. The Louisiana Constitution provides tiiat the appellate jurisdiction of a court of appeal extends to law and facts, La. Const. 1974, Art. V, Sec. 10(B). This provision, resulting from Louisiana's history as a civilian jurisdiction, has been interpreted as giving an appellate. court the power to decide the factual issues de novo. The exercise of this power is limited, however, by the jurisprudential rule of practice that a trial court's factual finding will not be upset unless it is manifestly erroneous or clearly wrong. Nevertheless, when the court of appeal finds that a reversible error of law or manifest error of material fact was made in the trial court', it is required to redetermine the facts de novo 'from the entire record and render a judgment on the merits. Gonzales v. Xerox Corp., 254 La. 182, 320 So.2d 163 (1975). See also, McLean v. Hunter, 495 So.2d 1298 (La. 1986); Otto v. State Farm Mut. Ins. Co., 455 So.2d 1175 (La.1984); Ragas v. Argonaut Southwest Ins. Co., 388 So.2d 707 (La.1980),
Rosell, 549 So.2d at 844, n. 2.

. See e.g., R.J. v. M.J., 03-2676, p. 9 (La.App. 1 Cir. 5/14/04), 880 So.2d 20, 26 (finding significant evidence that the mother “constantly uses foul and obscene language around the home, in the presence of her children, as well as in simple business transactions[1]’.) In addition, we note Dr. Pellegrin's 2009 custody evaluation noted no apparent psychopathologies with Ms. Hilkirk or any history of psychiatric or substance abuse problems.

. But cf., Elliot v. Elliot, 05-0181, pp. 10-13 (La.App. 1 Cir. 5/11/05), 916 So.2d 221, 228-230 (finding that the parties failure to communicate and get along with the other parent may affect the best interests of the child, but these traits alone do not rise to the level of a material change in circumstances sufficient to modify the existing custody decree.).

. L.J. is currently 15 years old and she has had several months to engage in therapy and to reconcile with Mr. Johnson. Accordingly, the trial court may deem it prudent to allow L.J. to express her preference with regard to home and school environment for her formative teenager years.

. La. C.C.P. art. 2128.